## BLUE v. HERKIMER NAT. BANK.

(District Court, N. D. New York. December 3, 1921.)

1. Highways ⬅113(4)—Assignments of moneys due contractor on road held properly filed.

Assignments of moneys due a road contractor from a state and county, filed with the state commissioner of highways, as the head of the department having charge of the construction of such improvement, and the state comptroller, as the officer charged with the custody and disbursement of the funds applicable to the contract therefor, and with the county treasurer, were filed as required by Lien Law N. Y. § 16, though not filed with the state treasurer, though the latter should file such assignments when requested.

2. Bankruptcy ⬅303(3)—Evidence held insufficient to show assignments of moneys due bankrupt made to defraud creditors.

In a suit by a trustee in bankruptcy to set aside assignments of moneys due the bankrupt from a state and county on road contracts, evidence held insufficient to show a mutual plan of the bankrupt and defendant assignee to defraud creditors.

3. Bankruptcy ⬅303(3)—Evidence held to show bill of sale security for loan, not absolute transfer.

In a suit against a national bank by a trustee in bankruptcy to set aside a bill of sale of road machinery of the bankrupt, the conduct of the parties, together with the great disparity between the value of the property and the consideration therefor and the fact the transferee was a national bank not authorized to engage in business other than banking, though it might take property in good faith in payment of banking debts previously contracted, held to show that the bill was given as security for money loaned and was not intended as an absolute transfer.

4. **Bankruptcy** ⬅️302(4)—**Bill of sale not set aside because not filed in town clerk's office or followed by early transfer of possession.**

A court, on petition of a trustee in bankruptcy, cannot cancel a bill of sale of road machinery of the bankrupt on the ground it was not filed in the proper town clerk's office or followed by such early transfer of possession as the state statute requires, in the absence of a prayer for such relief and allegations that the instrument was intended to be a chattel mortgage.

5. **Bankruptcy** ⬅️303(3)—**Evidence held insufficient to show bill of sale executed to defraud creditors.**

In a suit by a trustee in bankruptcy to set aside a bill of sale of road machinery of the bankrupt and for an accounting for the proceeds of the subsequent rental and sale thereof, evidence *held* insufficient, even though the instrument were intended as an absolute transfer, to show an intent to defraud creditors.

In Bankruptcy. Suit by A. Grant Blue, trustee in bankruptcy, against the Herkimer National Bank. Complaint dismissed without prejudice.

Willis, Doolittle & Guile, of Utica, N. Y. (Danaher & Danaher, of Meriden, Conn., of counsel), for plaintiff.

Snyder, Cristman & Earl, of Herkimer, N. Y., for defendant.

COOPER, District Judge. This is a suit in equity brought by the plaintiff as trustee in bankruptcy of Charles W. Tryon against the defendant, the Herkimer National Bank, to cancel and set aside two assignments of moneys due and to become due the bankrupt from the state of New York and the county of Madison on two certain road contracts and a bill of sale of road machinery of the said bankrupt and to compel the defendant bank to account for the moneys so received and the proceeds of the sale and rental of the road machinery.

The two assignments of moneys were made August 21, 1917, and the bill of sale was made September 1, 1917. The petition in bankruptcy was filed on the 4th of February, 1918. The transfers were filed with the head of the highway department of the state of New York, the state comptroller, and the county treasurer of the counties in which the roads were located. The bill of sale was filed in the Herkimer county clerk's office in the town of Herkimer, which was not the town of the bankrupt's residence nor the town in which the machinery was located.

The plaintiff brought this suit upon the theory that at the time of these transfers the bankrupt was insolvent and that both the bankrupt and the bank knew he was insolvent; that there was a mutual plan and scheme of the bankrupt Tryon and the defendant bank to hinder, delay, and defraud creditors, to carry the bank over the four months' statutory period, to enable the bank to secure a preference; and that as a corollary to the conduct of the bankrupt and the bank, the bankrupt was enabled to lull his creditors into security and to hold himself out as the owner of the road building machinery, by means of which he is alleged to have falsely secured credit.

The defense is that Tryon was not insolvent at the time of the

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

transfer; that the transfers were made prior to the four months' statutory period before bankruptcy; that if he were insolvent, he had no knowledge of his insolvency; that in any event, the bank had no knowledge that Tryon was insolvent at the time the transfers were made or had knowledge of facts sufficient to put it on inquiry; that the bank was entirely innocent and there was entire absence of fraud in the transaction.

It appears by the evidence that prior to 1916 the bankrupt was engaged in road building construction work in and about Meriden, Conn., and elsewhere. In 1916 he entered into a contract with the state of New York for the construction of the Poland-Trenton Highway in the county of Herkimer, moving himself and his family to the village of Poland, near the road, where he resided up to the time of the bankruptcy. Shortly thereafter he entered into a second contract with the state and the county of Madison for the construction of the Munsville-Pratts-Hollow-Pine-Woods county highway in the county of Madison. Both these roads were practically completed at the time of the bankruptcy.

In July, 1916, he had a conversation with Robert Earl, president of the defendant bank, with whom all important transactions took place. He asked for a loan of money, which was not definitely fixed but was to approximate $5,000. He informed Earl that he was borrowing money from a certain person of Meriden, Conn., who, he said, was charging him interest at the rate of 24 per cent. per year. He stated that his road building machinery was worth about $30,000; that he had real property in Meriden, Conn., in which his equity was about $8,000, and he had certain moneys coming on the Poland road contract and a small balance due on a previous contract in Rensselaer county in the state of New York. He said he expected to make a profit of about $8,000 on each of the two roads. He said his debts approximated $15,800 besides about $6,000 owed to the Acme Road Machinery Company, secured by conditional sale contract handled by the Acme Company on a portion of the road machinery.

Of this $15,800, about $14,300 was due to an individual of Meriden, Conn., or to the individual and the bank of Meriden.

Tryon agreed to give the bank security upon his road-building machinery and an assignment of moneys due, and to become due, from the state of New York and from the county of Madison on the two roads, to protect the bank for the loan of the said $5,000.

Money was advanced by the bank to Tryon on notes made by him and indorsed by his wife. No formal assignments of money or security on the road machinery was given at the time, and not until over a year thereafter. With the entry of the United States into the war with Germany, the prices of labor, materials, and equipment greatly advanced. The debt of Tryon to the bank increased so that by August, 1917, it was about $21,000. Earl and Tryon got in touch with each other, and the bill of sale of the road machinery and the assignments of the moneys were prepared by an attorney in Herkimer, apparently in conformity with the arrangements made in July, 1916.

At the time of the delivery of these assignments and the bill of sale, the bank inquired of Tryon as to his financial condition and was informed that about $2,000 had been paid on the Meriden indebtedness and that a Buffalo debt of $1,000 had been paid, but that Tryon owed the Acme Road Machinery Company about $3,000 more than at the time of the arrangement in July, 1916; the said increase being due to the purchasing of additional machinery, which additional machinery was held as security for such amount.

After the assignments and the bill of sale were given, the business kept on as usual, no evident change of possession or ownership of the road building machinery taking place, Tryon continuing in charge of the work, apparently as before. During all the intervening period, moneys advanced by the bank to Tryon had been upon notes made by him and indorsed by his wife and when they became due they were charged to his account, and new notes, sometimes with slight reductions in amount, were given in renewal thereof. After the bill of sale the bank procured insurance in its own name but took no other steps in the way of asserting dominion over the property. At the time of the assignments of the moneys and the giving of the bill of sale, it was agreed that Tryon would need about $6,000 more to complete the roads, and this the bank agreed to advance. After the filing of the assignments, as the moneys were received from the state on the monthly estimates, they were deposited in Tryon's account by the bank. Maturing notes continued to be charged to his account and the proceeds of renewal notes and additional notes were credited to his account. Tryon continued paying laborers and procuring materials as before.

Tryon paid with checks on the Herkimer Bank certain payments due the individual of Meriden, Conn., his largest creditor other than the Herkimer Bank. This individual had knowledge that Tryon was obtaining money from the Herkimer Bank for his road work.

The Poland road was completed along about November, 1917, except labor and materials to the extent of about $300, and arrangement was made with the New York state highway department to retain that sum and pay the remainder of the moneys, including retained percentage, due on the road contract to the Herkimer Bank; and this was done.

The Madison county road was also practically completed, and nearly all the moneys likewise paid to the Herkimer Bank. Thereafter and a few weeks before the bankruptcy, the Herkimer Bank took possession of the road machinery and leased it for a time, from which it received upwards of $4,000 in rentals and subsequently, after the filing of the petition in bankruptcy, sold it, and still has in its possession the proceeds of the sale, less expenses of repairs and maintenance. The sale was had pursuant to an order made in the bankruptcy court under stipulations for preservation of the proceeds of the sale. The petition in bankruptcy was prepared by the same attorney who prepared the assignments and the bill of sale. The attorney's charge was paid by moneys received by Tryon from the defendant bank.

Just prior to the filing of the petition in bankruptcy, Earl opened up a special account in his own name with moneys received from the

state, by means of which he sought to pay some of the notes and other indebtedness.

By the time of the bankruptcy the bank had advanced to Tryon the sum of about $27,000. The schedules in the petition in bankruptcy show an indebtedness of $42,000, not including anything due the defendant. Of this amount $8,766.32 was due the Acme Road Building Company and was secured by conditional bill of sale. The indebtedness to the individual in Meriden and the bank of Meriden is stated to be $27,000, though apparently no loans were made by the individual or the bank in Meriden to Tryon at any time after Tryon began to do business with the Herkimer Bank. Some of the remainder were debts of more than six months' standing.

Upon the trial Tryon was not able to produce checks showing the disposition of the whole of these moneys, though many checks showing the use of the greater part thereof were produced by him.

This case must be considered from two aspects: First, that of the assignment of the moneys; and, second, the bill of sale.

Plaintiff relies for his proof of fraudulent co-operation with Tryon and the bank largely upon the facts above stated and the inferences to be drawn therefrom. There appears in the record no direct proof of any fraud on the part of the bank.

[1, 2] This court can find nothing which satisfactorily establishes any fraud on the part of the defendant bank. The bank advanced to Tryon the moneys, and the transactions with him so far as the bank records are concerned were conducted in the usual manner of banking. Tryon was introduced to the bank by a well-known customer, a responsible manufacturer of Herkimer county, who was also well known to the president. Up to the time of the giving of the assignments and the bill of sale, there is nothing shown which is inconsistent with the entire innocence and good faith on the part of the bank. The assignments by Tryon of the moneys due on the road contract were made in the customary way and were filed in all the places in which the statute requires such assignments to be filed. The moneys were paid by the state to the assignee, the bank, in the ordinary way.

The plaintiff contends that the assignments are invalid because not filed in all the statutory places and that failure to so file is also evidence of fraud. The statute providing for such assignments as set forth in section 16 of the Lien Law of the State of New York (Consol. Laws, c. 33) is as follows:

"No assignment of a contract for a public improvement, or of the money, or any part thereof, due, or to become due, therefor, nor an order drawn by the contractor * * * upon * * * the head of the department or bureau having charge of the construction of such public improvement, * * * or other officer or person charged with the custody and disbursement of the corporate funds applicable to the contract for such public improvement, shall be valid unless such assignment or order, or a copy thereof, be filed * * * with the head of the department or bureau having charge of such construction, and with the * * * other officer or person charged with the custody and disbursement of the corporate funds applicable to the contract for such public improvement, and such assignment or order shall have effect and be enforcible from the time of such filing. * * * The * * * other

officer or person with whom the assignment, * * * or a copy thereof, is filed, shall enter the facts relating to the same in the lien book or other book provided for such purpose."

The assignments of moneys due and to become due were filed within 10 days with the state commissioner of highways, who is the head of that department or bureau; and with the state comptroller, as the financial officer of the state; and also with the treasurer of Madison county, as the financial officer of the county. This was a strict compliance with the letter of the law. The plaintiff contends that it should also have been filed with the state treasurer and cites as authority therefor the opinion of the Attorney General of the state for 1909 (page 401). The opinion merely states that where persons insist on also filing their assignments with the treasurer he should accept them. In other words, the comptroller draws the warrants before any money can be paid by the state treasurer and filing with the latter is not essential, but where assignees request such assignments to be filed with the state treasurer, then they should be filed. The rigid observance of the statutory requirements is all that can be asked. This adherence, therefore, relates back to the question of fraud, as to whether there was a concealment and suppression on the part of the bank or an open and proper transaction.

Nothing happened thereafter prior to the time of the bankruptcy which tends in any manner to establish fraud, so far as these assignments are concerned. The bank undoubtedly came to the conclusion that if Tryon was not financed so that he could complete the road, the completion of it by the state highway department or by some other contractor, after advertising for bids, would cost a great deal more and would jeopardize the moneys already advanced to Tryon. The payment by the bank to the attorney of $150 is somewhat equivocal in its character but, at its worst, only a suspicious circumstance. It may easily be that the bank felt sufficiently friendly to Tryon to advance him this money. At any rate, there are no circumstances which satisfactorily establish any fraud on the part of the bank. The plaintiff cannot, therefore, succeed so far as the assignments are concerned.

The position of the bank with reference to the transfer of the road machinery, called the bill of sale, is somewhat different.

Courts of equity will not be bound by the form or language of the instrument of transfer nor by its characterization by witnesses or parties at a later date under different circumstances, but will look to the intent of the parties.

[3] The original intent was that the bank was to be given security on the road machinery. Nothing else is contended or could be contended, especially when there was so great disparity between the value of the property transferred and the amount of money which passed, and where the transferee is a bank.

According to the bank's contention, Tryon's condition, except as to its own indebtedness, was better at the time of the giving of the bill of sale and the assignments than at the time of the agreement to give them. In spite of the increase in the indebtedness to the bank, there was still too much disparity of value to warrant the assumption that

the agreement to give security was changed to an agreement for an absolute transfer in the absence of clear and convincing evidence and circumstances. Such are not shown here. Aside from the form of the instrument and the insuring of the property in the bank's name, practically all of the conduct of the parties is consistent only with the intent that the bill of sale was given as part of the security for the money loaned and to be loaned. Security is the usual form in which banks safeguard their loans. They thereby retain the liability of the debtor for any deficiency. Banks, especially national banks, are not authorized to engage in business other than banking, though they may take property in good faith in payment or part payment of banking debts previously contracted, but usually by foreclosure of security given therefor.

[4] Viewed as a chattel mortgage, the bill of sale would be invalid as to creditors if not filed in the proper town clerk's office or followed by such early transfer of possession as the statute of New York requires.

But the court cannot give such relief in this action for the reason that the suit is not properly brought with appropriate allegations for such purpose.

There is no allegation that the instrument was intended to be a chattel mortgage, and no such relief asked.

The defendant was given no notice of such claim and has not been called upon to litigate it. Such relief must therefore await an appropriate action, and then decision will be made upon the proof then presented.

[5] The question as to whether or not the defendant bank would have a lien upon the chattels covered by the so-called bill of sale for moneys advanced, even if decreed to be a chattel mortgage and invalid as against creditors, must await such action for decision. Viewing the so-called bill of sale as in reality a chattel mortgage, much of the evidence relied upon by plaintiff as proof of fraud becomes harmless. Even considering the instrument as an absolute transfer, the court is unable to find satisfactory evidence of fraud upon which to find for the plaintiff.

The complaint must therefore be dismissed, but without prejudice to the bringing of an appropriate action to have the transfer in the form of a bill of sale decreed to be a chattel mortgage.

Judgment may be entered accordingly.